McGriff Ins. Servs., Inc. v. Hudson, 2023 NCBC 3.

STATE OF NORTH CAROLINA

FORSYTH COUNTY

MCGRIFF INSURANCE SERVICES, INC.,

Plaintiff,

v.

RYAN HUDSON and DIGITAL INSURANCE, LLC d/b/a ONEDIGITAL HEALTH AND BENEFITS,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
22 CVS 680

**ORDER AND OPINION ON PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT, DIGITAL INSURANCE, LLC'S MOTION TO DISMISS, HUDSON'S MOTION TO DISMISS, AND PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS**

1.      Ryan Hudson worked for McGriff Insurance Services, Inc. ("McGriff"), formerly BB&T Insurance, servicing its clients' employee benefits needs for more than a decade. He decided to open his own consulting business in late 2021, and his former employer alleges that he is profiting from moving its client relationships to a competitor and soliciting its employees, all in violation of an employment agreement he signed when he began work years ago. McGriff sues for violation of that agreement, interference with its customer relationships, misappropriation of its trade secrets, and unfair and deceptive trade practices. Hudson counterclaims, contending that it is McGriff that has interfered with his new business.

2.      Suit was originally brought against Hudson and OneDigital on 9 February 2022. (ECF No. 4.) On 10 May 2022, McGriff filed a motion for leave to amend its Complaint. (ECF No. 54.) Among other things, McGriff seeks to add Hudson's former co-worker, Katherine Stetson, as a defendant.

3.    The case is before the Court on four motions: Defendant Digital Insurance, LLC's Motion to Dismiss Plaintiff's Complaint, (ECF No. 31), Defendant Ryan Hudson's Motion to Dismiss, (ECF No. 34), Plaintiff's Motion for Leave to Amend Complaint, (ECF No. 54) (collectively, the "Complaint Motions"), and Plaintiff/Counter-Defendant's Motion to Dismiss Counterclaims, (ECF No. 48) (the "Counterclaim Motion," together with Complaint Motions, the "Motions").

4.    The Court, having considered the Motions, the briefs supporting and opposing the Motions, the parties' arguments at a hearing held on 11 August 2022, and other relevant matters of record, concludes for the reasons stated below that Plaintiff's Motion for Leave to Amend Complaint should be **GRANTED in part and DENIED in part**, Defendants' Motions to Dismiss should be **DENIED**, and Plaintiff/Counter-Defendant's Motion to Dismiss Counterclaims should be **DENIED**.

*Constangy, Brooks, Smith & Prophete, LLP, by Jill S. Stricklin, Jacqueline C. Johnson, and Rodrigo J. Pocasangre, for Plaintiff McGriff Insurance Services, Inc.*

*Morris, Manning & Martin, LLP, by Seslee S. Smith, Meredith W, Caiafa, and Kevin T. Gray, for Defendant Digital Insurance, LLC.*

*Johnston, Allison & Hord, P.A., by Kimberly J. Kirk and Katie D. Burchette, for Defendant Ryan Hudson.*

## I.    FACTS AND PROCEDURAL BACKGROUND

5.    The Court does not make findings of fact when ruling on either a motion to dismiss or a motion to amend.  It recites below those factual allegations from the Complaint and its proposed amendment that are relevant and necessary to the Court's determination of the motions before it. *See, e.g., Krawiec v. Manly*, 370 N.C. 602, 606 (2018).

6. McGriff, formerly known as BB&T Insurance Services, Inc. ("BB&T Insurance"), is a full-service insurance broker.[1] The insurance services it provides include commercial property and casualty, corporate bonding and surety services, cyber, management liability, captives and alternative risk transfer programs, small business, employee benefits, title insurance, and personal lines. McGriff is headquartered in Charlotte, North Carolina, but provides "risk management and insurance solutions to clients across the United States." (Prop. Am. Compl. ¶¶ 1–2, ECF No. 55.1.)

7. Hudson was hired by McGriff as an Employee Benefits Insurance Agent on 1 February 2010. He was based in Charlotte. (Prop. Am. Compl. ¶¶ 6, 25; Ex. A §2(b) ["Employment Agreement"], ECF No. 55.3.) McGriff alleges that, during his employment, Hudson developed customer relationships that were integral "to the success of the BB&T Insurance/McGriff facility in Charlotte[.]" (Prop. Am. Compl. ¶ 29.)

8. Stetson became employed by McGriff in March 2001 as a Total Account Agent and was later promoted to Account Manager. (Prop. Am. Compl. ¶ 16.) She worked closely with Hudson to service accounts and maintained significant and on-going contact with McGriff's customers and prospective customers with respect to the sale, purchase, and service of Employee Benefits insurance products. (Prop. Am. Compl. ¶ 28.)

---

[1] The Court uses the terms "McGriff" and "BB&T Insurance" interchangeably in this Order and Opinion to refer to Plaintiff.

## Hudson's Employment Agreement

9. Prior to beginning work, as a condition of his employment, Hudson signed an employment agreement containing non-solicitation provisions (the "Employment Agreement"). (Prop. Am. Compl. ¶ 7; Employment Agreement.)

10. Paragraph 8(a)(iii) of Hudson's Employment Agreement dictates that Hudson may not "[s]olicit, contact, divert, or call upon with the intent of doing business with, any 'BB&T Insurance Customer' . . . on [Hudson's] own behalf or on behalf of any Competitive Business . . . if the purpose of the activity is to solicit the BB&T Insurance Customer for a Competitive Business[.]" (Employment Agreement ¶ 8(a)(iii).)

11. The Employment Agreement defines "BB&T Insurance Customer" as any "company or individual customer of BB&T Insurance with whom, within the two-year period ending with the termination of Employee's employment, Employee had material contact or who was otherwise contacted or served by Employee regarding (A) the sale, trade, or service or the attempted sale, trade or service of business insurance products or (B) any other business activities of BB&T Insurance." (Employment Agreement ¶ 8(b)(ii)).

12. The Employment Agreement defines "Competitive Business" as "an enterprise that is in the business of selling, trading, or servicing business insurance products that are competitive with those offered by BB&T Insurance during the term of Employee's employment with BB&T Insurance." (Employment Agreement ¶ 8(b)(i).)

13. Paragraph 8(a)(i) of the Employment Agreement requires that Hudson not "[s]olicit, recruit, encourage or support any employee of BB&T Insurance who had performed work for BB&T Insurance within the last year of [Hudson's] employment with BB&T Insurance to leave the employment of BB&T Insurance[.]" (Employment Agreement ¶ 8(a)(i)).

14. In paragraph 11 of the Employment Agreement, Hudson agreed that during his employment and for three years thereafter, he would not:

> (i) misappropriate; (ii) use for the purpose of competing with BB&T Insurance, either directly or indirectly; (iii) disclose to any third party, either directly or indirectly; or (iv) aid anyone else in disclosing to any third party, either directly or indirectly, all or any part of any "Confidential Information" . . . to the extent that such Confidential Information does not rise to the level of a trade secret under applicable law.

> To the extent that said Confidential Information does rise to the level of a trade secret under applicable law, then . . . Employee will act in accordance with the terms of applicable law governing trade secrets.

(Employment Agreement ¶ 11(a).)

15. The Employment Agreement defines "Confidential Information" broadly to include, among other things, "any confidential, proprietary BB&T Insurance information regarding a customer of BB&T Insurance, including but not limited to customer lists, contracts, information, requirements, billing histories, marketing methods, needs and products or services provided by BB&T Insurance to such customers" and "all confidential information relating to BB&T Insurance's . . . employee lists, personnel matters[.]" (Employment Agreement ¶ 11(b)(ii), (vi).)

## Stetson's Non-Solicitation Agreement

16.     About four and a half years after starting work, Stetson signed a non-solicitation agreement (the "Non-Solicitation Agreement"). In exchange for signing the agreement, Stetson became eligible to receive an annual bonus. (Prop. Am. Compl. ¶ 17; Ex. D ["Non-Solicitation Agreement"], ECF No. 55.6.)

17.     Stetson's Non-Solicitation Agreement does not permit her to "[s]olicit, encourage or support any employee of BB&T Insurance who had performed work for BB&T Insurance within the last year of [Stetson's] employment with BB&T Insurance to leave the employment of BB&T Insurance[.]" (Non-Solicitation Agreement ¶ 2(a)(i).)

18.     Stetson also may not "[s]olicit, divert, or call upon with the intent of doing business with, as or on behalf of any business in competition with BB&T Insurance, any 'BB&T Insurance Customer' . . . for the purpose of engaging in any 'Competitive Activity[.]' " (Non-Solicitation Agreement ¶ 2(a)(iii)).

19.     In addition, Stetson's Non-Solicitation Agreement contains a pledge of confidentiality identical in material respects to Hudson's Employment Agreement. (*See* Non-Solicitation Agreement ¶ 4.)

20.     Both Hudson and Stetson were provided access to McGriff's confidential information to enable them to perform their jobs. (Prop. Am. Compl. ¶ 30.) McGriff alleges that this information included:

> (A) Customer lists and contact information, including the identity of specific customer contacts and point persons; (B) Customer preferences, requirements and buying patterns, including products and services provided to such customers, pricing/premium structures, billing

histories, policy cost and sales information, insurance expiration dates, insurance renewal schedules, fee agreements, applications, underwriting, proposals, certificate of holder lists, and claims history; (C) Marketing and sales strategies, financial, operational and customer service information; (D) Detailed compilations of data, created over significant periods of time, regarding each of its customers; and (E) Other internal business information that is proprietary in nature, confidential to BB&T Insurance/McGriff, and not generally available to its competitors or the public at large.

(Prop. Am. Compl. ¶ 30.)

21. The information also included electronic workbooks known as "Watson Reports," which contained a "detailed financial snapshot" of each insurance customer's plan. (Prop. Am. Compl. ¶ 32.)

22. Hudson and Stetson also had access to "Sherlock Reports," proprietary reports containing information related to insurance plan renewals, including comparative quotes that BB&T obtained for its customers. (Prop. Am. Compl. ¶ 33.)

23. McGriff alleges that it made efforts to protect this information through the use of confidentiality provisions in employment agreements and by implementing a Code of Ethics, a Corporate Information Security policy, password protection, and dual authentication. (Prop. Am. Compl. ¶ 35).

### OneDigital

24. Digital Insurance, LLC ("OneDigital"), headquartered in Atlanta, Georgia, provides advisory consulting and technology solutions to employers regarding their employee benefits and insurance needs. In that respect, OneDigital and McGriff are allegedly direct competitors. (Prop. Am. Compl. ¶ 5.)

25. On 1 September 2021, Hudson notified McGriff of his resignation. (Prop. Am. Compl. ¶ 39.) Hudson has since done business as "Hudson InsuranceConsulting," but McGriff alleges that OneDigital exercises control over Hudson's business operations, instructs Hudson on how he should conduct business, and directs Hudson to comply with its requirements. (Prop. Am. Compl. ¶¶ 46, 50.)

26. Shortly after leaving McGriff, Hudson announced the formation of Hudson Consulting Group in a LinkedIn post and encouraged anyone interested in his services to reach out to him. (Prop. Am. Compl. ¶ 62.) Several McGriff customers replied directly to this post. (Prop. Am. Compl. ¶ 64.)

27. Hudson has allegedly referred McGriff's current and prospective customers to OneDigital in exchange for fifty percent (50%) of OneDigital's net commission received. (Prop. Am. Compl. ¶ 47.)

28. McGriff alleges that this business arrangement has given OneDigital access to confidential information and trade secrets belonging to McGriff, as well as to Hudson and Stetson's book of business. (Prop. Am. Compl. ¶ 51.)

29. Stetson resigned from McGriff two weeks after Hudson left. (Prop. Am. Compl. ¶ 43). She went to work for OneDigital in a position designed to provide support for Hudson's business activities. (Prop. Am. Compl. ¶¶ 44, 48.)

30. McGriff alleges that Hudson and Stetson, working with OneDigital employees, have violated their agreements not to solicit McGriff's insurance customers. (Prop. Am. Compl. ¶ 66.)

31. McGriff further alleges that Hudson and Stetson have encouraged other McGriff employees to resign and become employed by OneDigital, and that Hudson has provided OneDigital with the names, positions, and contact information for McGriff employees. (Prop. Am. Compl. ¶ 58.)

32. In addition, McGriff contends that in anticipation of his departure, Hudson took a number of steps to solicit customers away from McGriff and to prevent McGriff executives from building relationships with certain clients. (Prop. Am. Compl. ¶¶ 59–60.)

33. For example, with certain employee benefits customers, McGriff enters into Employee Benefits Broker Services Agreements ("Fee Agreements") whereby the customer agrees to pay McGriff a fee for insurance placement and employee benefit management services. (Prop. Am. Compl. ¶ 37.) Typically, Fee Agreements may be terminated upon thirty (30) days' notice by either party. (Prop. Am. Compl. ¶ 38.)

34. Prior to his departure, Hudson allegedly failed to procure Fee Agreement renewals for certain McGriff customers so that he could later solicit the business for OneDigital. (Prop. Am. Compl. ¶ 61.) After his departure, Hudson has allegedly suggested to McGriff customers ways to avoid paying the amounts due under their Fee Agreements with McGriff. (Prop. Am. Compl. ¶ 84.)

35. Moreover, Hudson and Stetson allegedly provided OneDigital with confidential customer information that they acquired as employees of McGriff. (Prop. Am. Compl. ¶ 69.) Hudson had access to this information, in part, through Stetson. (Prop. Am. Compl. ¶ 51.) The information includes Fee Agreements, contact

information for customer point persons, and insurance renewal dates, as well as McGriff's disclosure and reporting compliance guide, and its Watson and Sherlock Report templates. (Prop. Am. Compl. ¶¶ 70, 71, 75–77.)

## II. STANDARD OF REVIEW

36. Dismissal of a claim pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") is proper if "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103 (1970) (emphasis omitted).

37. When deciding a Rule 12(b)(6) motion, the Court construes the complaint liberally and accepts all allegations as true. *See, e.g., Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019); *Laster v. Francis*, 199 N.C. App. 572, 577 (2009). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)). In its review, the Court may consider documents that are the subject of the Complaint and to which the Complaint specifically refers, including the contracts that form the subject matter of

the action. *See, e.g., McDonald v. Bank of N.Y. Mellon Trust Co.*, 259 N.C. App. 582, 586 (2018); *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001).

38. On a motion to amend, Rule 15(a) provides that, after a responsive pleading has been served, a party may amend his pleading only by leave of court or by written consent of the adverse party, and "leave shall be freely given when justice so requires." N.C.G.S. § 1A-1, R. 15(a). Reasons justifying denial of a motion to amend are undue delay, bad faith, dilatory motive, repeated failure to cure defects by previous amendments, undue prejudice, and futility of the amendment. *See JPMorgan Chase Bank, N.A. v. Browning*, 230 N.C. App. 537, 541 (2013).

39. "Ultimately, whether to allow an amendment rests in the trial judge's discretion." *KRG New Hill Place, LLC v. Springs Invs., LLC*, 2015 NCBC LEXIS 20, at *8 (N.C. Super. Ct. Feb. 27, 2015) (citing *House of Raeford Farms, Inc. v. Raeford*, 104 N.C. App. 280, 282 (1991)).

40. A claim under N.C.G.S. § 75-1.1 predicated on allegations of deceptive conduct is governed by Rule 9(b). *See Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at **37 (N.C. Super. Ct. Nov. 4, 2020) (citing *Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 117 F. Supp. 3d 722, 731 (M.D.N.C. 2015) ("Rule 9(b) applies to section 75-1.1 claims alleging detrimental reliance on false or deceptive representations.")). Rule 9(b) requires allegations of "the time, place and contents of the fraudulent representation, the identity of the person making the representation and what was obtained by the fraudulent acts or representations" to be pleaded with particularity. *Terry v. Terry*, 302 N.C. 77, 85 (1981) (emphasis omitted).

# III. ANALYSIS

41. McGriff's Proposed Amended Complaint asserts five claims for relief: breach of contract against Hudson and Stetson, tortious interference with contract against Hudson and OneDigital, tortious interference with contract and prospective business relations against Hudson and OneDigital, misappropriation of trade secrets against all three Defendants, and unfair and deceptive trade practices against all three Defendants. (*See generally* Prop. Am. Compl.) Hudson and OneDigital seek to dismiss all of McGriff's claims, both as originally pled and as amended, for failure to state a claim upon which relief may be granted and because the proposed amended claims are futile.

42. Since the test for futility mirrors the sufficiency test for a motion to dismiss, the Court will evaluate McGriff's claims, original and proposed, using this same standard. *See Smith v. McRary*, 306 N.C. 664, 671 (1982) (an amendment was properly denied when "plaintiff's proposed amendment could not withstand a motion to dismiss for failure to state a claim"); *Bourgeois v. Lapelusa*, 2022 NCBC LEXIS 111, at **11 (N.C. Super. Ct. Sept. 23, 2022) ("test for futility with respect to a proposed amendment mirrors the sufficiency test of Rule 12(b)(6)"); *Gateway Mgmt Servs. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at *8 (N.C. Super. Ct. May 8, 2021) ("Although an amended pleading would ordinarily moot a pending motion to dismiss, the Court will consider Defendants' Motions to Dismiss as to the Amended Complaint because Defendants and Plaintiff both addressed the sufficiency of the Amended Complaint in their respective briefs and at the hearing.").

43. In response to McGriff's Complaint, Hudson asserted three counterclaims: (1) tortious interference with prospective economic advantage, (2) misrepresentation, and (3) violation of North Carolina's Unfair and Deceptive Trade Practices Act. (Def. Ryan Hudson's Answer and Counterclm. ["Counterclm."], ECF No. 36.) McGriff moved to dismiss all three. (*See* ECF No. 48.) However, Hudson has since voluntarily dismissed the second cause of action (misrepresentation), leaving only Hudson's first and third counterclaims for the Court's consideration. (*See* ECF No. 57.)

**Complaint Motions**

44. The Court begins with a review of the sufficiency of McGriff's proposed claims for relief.

**A. Breach of Contract (Hudson and Stetson)**

45. There are two contracts at issue in this case: Hudson's Employment Agreement and Stetson's Non-Solicitation Agreement. By virtue of their respective agreements, both Hudson and Stetson promised not to (1) solicit employees, (2) solicit customers, and (3) reveal confidential information.

46. The elements of a claim for breach of contract are "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 137 N.C. App. 19, 26 (2000).

47. Here, the alleged breach involves restrictive covenants in the form of non-solicitation provisions. To be valid in North Carolina, a restrictive covenant must be: "(1) in writing; (2) part of an employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a

legitimate business interest." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655 (2009).

48. The restrictive covenants in this case take the form of promises not to solicit customers or employees of McGriff. Although non-solicitation agreements "must meet the same requirements as are applied to the covenant not to compete[,]" *Aeroflow Inc. v. Arias*, 2011 NCBC LEXIS 21, at **24 (N.C. Super. Ct. July 5, 2011), "non-solicitation agreements are more easily enforced." *Id.* at **24 fn.8 (citing *Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F.Supp. 2d 664 (M.D.N.C. 2009). *See also, Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at **36 (N.C. Super. Ct. Aug. 1, 2016). This is because, in general, non-solicitation provisions are "more tailored and less onerous on employees' ability to earn a living" than noncompete restrictions. *Azko Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at **31 (N.C. Super. Ct. Nov. 3, 2011).

49. Nonetheless, restrictive covenants as a whole are "not viewed favorably in modern law[,]" *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 311 (1994), and must be carefully scrutinized. *ChemiMetals Processing v. McEneny*, 124 N.C. App. 194, 197 (1996).

50. A central principle for determining whether a restrictive covenant is enforceable is whether it is tailored to be no more burdensome than is necessary to protect a legitimate business interest of the employer. If the covenant is "too broad to be a reasonable protection to the employer's business[,] it will not be enforced." *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 529 (1989). *See also Hartman*,

117 N.C. App. at 316 (a covenant "must be no wider in scope than is necessary to protect the business of the employer"); *Bite Busters, LLC v. Burris*, 2021 NCBC LEXIS 26, at \*\*15–16 (N.C. Super. Ct. March 25, 2021) (employer must establish a protectable interest and show the prohibition is no broader than necessary to protect that interest).

51.     Whether a restrictive covenant is reasonable and enforceable is a matter of law for the Court to decide. *See Farr Assocs. v. Baskin*, 138 N.C. App. 276, 279 (2000).

52.     Defendants Hudson and Stetson argue that the covenants at issue here are unenforceable for two reasons. First, they contend that no contracts were formed due in each instance to a lack of consideration. Second, Defendants argue that the restrictive covenants at issue are not sufficiently tailored to McGriff's legitimate business interests to be enforceable. As a result, Hudson and Stetson contend that the breach of contract claim against each of them fails. (*See* Def. Mem. Opp'n Pl.'s Mot. Leave Am. Compl. 4–10 ["Hudson's Opp'n Mot. Am."], ECF No. 61.)

### 1. **Hudson's Contract**

53.     The Court begins with the parties' dispute over the sufficiency of the consideration to support Hudson's contract. Germane to this discussion is an "evergreen" provision in Hudson's Employment Agreement, which states:

> unless this Agreement is otherwise earlier terminated, this Agreement shall automatically renew for consecutive one-year terms . . . unless either party gives notice in writing to the other party, at least 30 days before the end of the current term, that it does not wish to renew this Agreement for an additional term.

(Employment Agreement ¶ 3(a)(iv).)

54. The parties spar over the effect of this provision, disagreeing on whether the non-solicitation obligations were adequately supported by consideration after the first one-year term. Hudson and Digital contend that new consideration was required to support the covenants when the contract automatically renewed in January 2011, and that continued employment alone was insufficient. (Digital's Memo. Supp. Mot. Dismiss Pl.'s Compl. 4–6 ["Digital's Mot. Dismiss Br."], ECF No. 32.)[2]

55. McGriff responds that Hudson's contract does not require additional consideration apart from the original offer of "evergreen" employment. Alternatively, McGriff argues that the potential for a severance package is consideration that supports each yearly renewal. (Mem. Opp'n Mots. Dismiss 3–4 ["Mem. Opp'n Mots. Dismiss"], ECF No. 45.)

56. In this instance, the Court agrees with McGriff. The original consideration—Hudson's offer of employment—is sufficient to support Hudson's continuing non-solicitation obligations. This is so because Hudson's Employment

---

[2] Hudson and Digital cite *American Air Filter Company, Inc. v. Price*, 2017 NCBC LEXIS 55 (N.C. Super. Ct. June 26, 2017), a North Carolina Business Court case applying Kentucky law, in support of their position. The language of the contract in *Price* differed from that found here. In *Price*, the non-solicitation obligations began when the agreement terminated, regardless of whether the employee continued employment. Once it began, the non-solicitation obligation ran until it expired, and then a new agreement with new consideration was necessary to create a new non-solicitation obligation. *Compare Price*, 2017 NCBC LEXIS 55, at *5–6 ("[i]f the Employee *terminates this Agreement* or Company *terminates this Agreement* for cause, then in either event, for a period of one (1) year after such termination, Employee will not . . . (b) solicit" (emphasis added)), *with* (Employment Agreement ¶ 8(a) ("Employee will not, during Employee's employment and for a period of two years following the date of *termination of Employee's employment* with BB&T Insurance . . . (i) Solicit[.]" (emphasis added))).

Agreement did not end and restart in a staccato series of mini agreements, but rather the term rolled from one year to the next continuously, until Hudson notified McGriff of his intention to end it.

57. The evergreen provision in Hudson's Employment Agreement, phrased as it is, requires affirmative action by the parties (or a terminating event like death) to end the employment relationship and trigger the non-solicitation obligations. Absent that affirmative action (or a terminating event), the plain language of the agreement establishes that the parties intended for the contract, with its non-solicitation obligations, to continue unabated year-to-year. *See Brown v. Ginn*, 181 N.C. App. 563, 567 (2007) ("The intent of the parties is determined by examining the plain language of the contract."). Because there was no break in the contractual relationship, no new consideration was necessary to support the non-solicitation obligations.[3]

58. Therefore, the Court determines that the employment relationship itself, unbroken by the parties, constitutes adequate consideration for the non-solicitation obligations in Hudson's Employment Agreement.

59. The Court next determines if the employee and customer non-solicitation provisions in the agreement are sufficiently tailored to McGriff's legitimate business interests. "The party seeking enforcement of a restrictive covenant has the burden

---

[3] Defendants' reliance on *Cox v. Dine-A-Mate, Inc.,* 129 N.C. App. 773, 777–78 (1998), is misplaced. Hudson did not sign a restrictive covenant *in the middle of his employment*, as was the case in *Cox. See id.* Instead, Hudson signed the restrictive covenant at the *beginning of his employment*. "[T]he North Carolina Supreme Court has held that keeping one's existing job is insufficient consideration for the signing of a covenant not to compete." *Id.* at 778 (citing *Paper Co. v. McAllister,* 253 N.C. 529 (1960)).

of proving its reasonableness." *Sandhills Home Care L.L.C.*, 2016 NCBC LEXIS 61, at **13. "If the covenant is wider in scope than is necessary to protect the business of the employer, 'it will not be enforced.'" *InVue Sec. Prods., Inc. v. Stein*, 2017 NCBC LEXIS 115, at *10 (N.C. Super. Ct. Dec. 18, 2017) (quoting *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (2004)).

a. **Non-Solicitation of Employees**

60.    Hudson agrees not to "[s]olicit, recruit, encourage or support any employee of BB&T Insurance who had performed work for BB&T Insurance within the last year of [Hudson's] employment with BB&T Insurance to leave the employment of BB&T insurance." (Employment Agreement ¶8(a)(i).)

61.    An employer may choose to protect not only its employment relationships but also its customer relationships, as well as its confidential information, through the use of employee non-solicitation agreements. *Current Med. Servs., LLC v. Current Dermatology, PLLC*, 2020 NCBC LEXIS 138, at *9 (N.C. Super. Ct. Nov. 2020) (typically, the purpose of a restriction against soliciting employees is to protect the employer's customer relationships and confidential information); *Wells Fargo Ins. Servs. USA v. Link*, 2018 NCBC LEXIS 42, at *28 (N.C. Super. Ct. May 8, 2018) (covenants restricting the solicitation of employees "are another means of protecting the former employer's interest in the good-will it has with its customers."); *Carlson Envtl. Consultants, PC v. Slayton*, 2017 U.S. Dist. LEXIS 154191, *25 (W.D.N.C. 2017) (protection of customer relationships and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer).    Moreover, the employer's investment in employee hiring, training and

retention may itself be a legitimate reason for it to use agreements designed to tamp down efforts by disgruntled former employees to recruit established employees.

62. The question here is whether Hudson's provision is broader than necessary to protect McGriff's legitimate interests. Hudson argues that this non-solicitation provision is too broad to enforce because "the class of off-limits employees is not tailored to (i) the employees with whom he has interacted, (ii) those who worked in the same region, or (iii) those who further a competitive business interest of McGriff. Still further. . . it prohibits. . . encouraging employees from leaving McGriff for reasons unrelated to competitive endeavors." (Hudson Br. Supp. Mot. Dismiss 16).

63. Hudson cites *Bite Busters* for the proposition that, to be reasonable, the employee non-solicitation provision must be limited to those employees with whom Hudson worked. But the decision in *Bite Busters* is more nuanced than Hudson suggests.

64. In *Bite Busters,* the Court found that a five-year restriction was unenforceable when the plaintiff did not plead the special circumstances necessary for the Court to determine that it was reasonable. *Id*. at **16—17. Included in the list of circumstances the plaintiff could have pled, but did not, were factors that addressed the protectible interest of customer goodwill, such as whether the defendant (who had customer contact) had worked with the employees, whether they worked in the same territories, and other factors that would have supported a conclusion that the restriction was necessary to protect customer goodwill because the protected employees provided services or developed relationships that would be

of value to a competitive business.[4]  Additionally, the Court observed that the former employer did not contend in briefing or oral argument that the restriction was necessary to protect customer goodwill or any other legitimate protectible interest. *Id.* at **17.

65.    Such is not the case here. In addition to customer goodwill, Hudson's Employment Agreement, incorporated in the Complaint, identifies as legitimate business interests both a desire to safeguard its proprietary and confidential information and the need to protect its investment in training its personnel. (Employment Agreement, Recitals.)   McGriff alleges that Hudson breached his promise in order to improve the talent at OneDigital, its competitor, at McGriff's expense.  (Prop. Am. Compl. ¶¶ 58, 93.)[5]

66.    While an employee's personal interaction with *customers* resulting in the development of customer goodwill plainly affords the employee the ability to sway

---

[4] Indeed, it was not clear to the Court that the restriction was even limited to the solicitation of the employer's *current* employees.  Clearly, an employer does not have a legitimate interest in preventing the solicitation of a *former* employee who may have worked for it once, but who no longer does.

[5] Defendants also cite *Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55 (N.C. Super. Ct. June 2021) for the proposition that "employers do not have a legitimate business interest in prohibiting solicitation of employees with whom the departing employee never interacted."  (Hudson Br. Supp. Mot. Dismiss 16) But as in *Bite Busters*, the Court in *Power Home Solar* included that factor among other listed factors that would have been necessary to protect customer goodwill, as one example of a legitimate protectible interest. It ultimately found the non-solicitation provision unenforceable because the Complaint did not reveal that the provision was reasonably necessary to protect *any* legitimate business interest of Power Home's.   Here, the restriction is narrowed to any employee "who had performed work for BB&T Insurance within the last year of Employee's employment," and the employer's investment in training is identified as one of several legitimate protectible interests.

customer allegiances, the same relationship-building activity may not be necessary to sway the allegiance of fellow *employees*. A departing employee who has seen what it is like to play for a new team may well be able to convince a former teammate–even one with whom he has not had previous personal interaction–to make the switch, creating a talent drain for his former employer.[6]

67. Indeed, the employer's protectible interest does not come from the departing employee's relationship with those employees he is attempting to solicit. It arises from the solicited employees' relationships with customers, their possession of

---

[6] Hudson asks that the Court take judicial notice of information on McGriff's website stating that McGriff is a full-service insurance broker with more than 3500 employees at over 120 offices. When a party requests that the Court take judicial notice of a fact and supplies the Court with the necessary information, the Court is required to take judicial notice of the fact if it otherwise satisfies Rule 201(b). See N.C. Gen. Stat. § 8C-1, Rule 201(d). That rule states that a Court may take judicial notice of adjudicative facts that are not subject to reasonable dispute if they are either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." N.C. R. Evid. 201(b). Hudson contends that the information it offers is accurate and should be considered with respect to its argument because McGriff is the keeper of the information, and McGriff is the one that posted it. Notably, McGriff does not contest its accuracy.

As long as the website's authenticity is not in dispute and the fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," the Court may take judicial notice of information available on a website. *See Herrera v. Charlotte Sch. of Law, LLC,* 2018 NCBC LEXIS 35, at *21 (N.C. Super. April 20, 2018) (citing *Feeling Great, Inc. v. N.C. Dep't of Revenue,* 2015 NCBC LEXIS 84, at *10 (N.C. Super. Ct. Aug. 20, 2015).

In this case, however, the Court is not able to accurately determine that McGriff has 3500 employees at over 120 offices by resort to anything other than McGriff's own website. However, absent objection from McGriff, the Court, in its discretion, takes judicial notice of the fact that McGriff's insurance business is sizeable and requires it to employ many more individuals than those with whom Hudson could have become personally acquainted in offices that span across a large territory. The Court considers this fact in its determination. *See Sivadhanam v. 7 Hills Learning, LLC,* 2021 NCBC LEXIS 74) ("On a motion to dismiss, the Court may 'consider records of which it has taken judicial notice' " (citation omitted)).

confidential information, or the cost to replace them. Even a loner can disrupt those business interests by luring others to follow the breadcrumbs of an exit path he has laid.[7]

68. Defendants' reliance on *Wells Fargo Ins. Servs. USA v. Link* is unavailing. In *Wells Fargo,* this Court evaluated an employee non-solicitation provision providing that "for two years following termination, [Defendants] "will not . . . solicit, recruit, or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services*." Wells Fargo*, 2018 NCBC LEXIS 42 at *26 (internal citation omitted.) The "Company" was defined to include not only Wells Fargo Insurance Services, but also its "past, present, and future parent companies, subsidiaries, predecessors, successors, affiliates, and acquisitions." *Id.* at *14 (internal citation omitted.) This Court concluded that the provision was unenforceable because the employer, Wells Fargo Insurance Services USA, had not alleged facts to support a finding that a restriction that stretched well beyond the confines of its business to cover all of its affiliates' businesses was necessary to protect

---

[7] For much the same reason, the Court is not persuaded by Hudson's citation to Virginia and Georgia case law to support his argument that the non-solicitation provision is overly broad because it is not limited strictly to solicitation that was "for a competitive purpose." (Hudson's Br. Supp. Mot. Dismiss 18-19.) Again, the employer's legitimate interests are implicated not just when an established employee leaves *to go to a competitor,* but simply when an established, trained and functioning employee leaves. His departure disrupts the *status quo* and costs the employer in lost efficiencies, as well as in the expense of recruiting and training his replacement. Therefore, if a former employee, perhaps motivated by nothing more than the adage, "misery loves company," urges another employee to become disenchanted and quit, the employer suffers an impact to its legitimate business interests, regardless of where the ex-employee ends up.

its goodwill with insurance customers. As this Court observed, "[i]t is highly unlikely that the vast majority of these employees would have had any involvement or contact with Wells Fargo's commercial insurance customers." *Id.* at *29.

69. The Complaint in the present case, unlike those in *Power Home Solar* and *Bite Busters,* alleges that the non-solicitation provision was necessary to protect legitimate employer interests, including its investment in training. It does not attempt to prevent the solicitation of employees working for numerous affiliates in unrelated businesses, as was the case in *Wells Fargo* and in the more recent decision *Relation Insurance Inc. v. Pilot Risk Mgmt. Consulting, LLC*, 2022 NCBC LEXIS 49 (N.C. Super. Ct. May 25, 2022). The provision here is limited to the solicitation of "any employee of [McGriff]," and further limited to only those current McGriff employees, "who had performed work for [McGriff] within the last year of Employee's employment." (Employment Agreement ¶ 8(a)(i).) Thus, the Court concludes that Hudson's employee non-solicitation provision is sufficiently narrowly drawn to protect McGriff's legitimate business interests.

b. **Non-Solicitation of Customers**

70. On the other hand, the Court determines that the customer non-solicitation provision in Hudson's contract is overly broad, at least in part. The provision prohibits Hudson from soliciting, contacting, diverting, or calling upon with the intent to do business any "BB&T Insurance Customer" if the purpose of the activity is to solicit the BB&T Insurance Customer for a "Competitive Business." (Employment Agreement ¶ 8(a)(iii).)

71. McGriff argues that the purpose of the provision is to prevent Hudson "from bankrolling on McGriff's customer goodwill (which Hudson was paid to develop on behalf of McGriff) on behalf of a competitor." (Mem. Opp'n Mots. Dismiss. 7.)

72. The devil here is in the definitions. The Agreement defines a "BB&T Insurance Customer" as one:

> with whom, within the two–year period ending with the termination of Employee's employment, Employee had material contact *or* who was otherwise contacted or served by Employee regarding (A) the sale, trade or service or the attempted sale, trade or service of business insurance products *or* (B) *any other business activity of BB&T Insurance.*

(Employment Agreement ¶8(b)(ii)) (emphasis added).

73. Defendants first argue that the "two-year period" specified in the first line above applies only to customers with whom the employee had material contact and does not apply to any language after the disjunctive "or." They argue that any attempt to apply the "two-year period" to the group described after the "or" would be grammatically nonsensical ("BB&T Insurance Customer" means any company or individual customer of BB&T Insurance *with whom,* within the two year period ending with the termination of Employee's employment, *who was* otherwise contacted or served by Employee[.]") According to Defendants, the disjunctive "or" separates the first group of customers from the second, leaving the second group uncircumscribed by time. (Hudson's Reply Br. 4-7.)

74. McGriff responds that the two-year period applies to both the first and second groups of customers as evidenced by the fact that there is no comma before the "or."

75. Despite this linguistic tangle, two things are clear at this stage. First, without a time boundary that applies to the second group of customers, Hudson would be prohibited from soliciting any customer he contacted or served during the entirety of his eleven-plus years of employment with McGriff, no matter how long ago or how fleeting the contact. Such a restriction is broader than is necessary to protect McGriff's goodwill with customers. See e.g., *Sterling Title Co. v. Martin*, 266 N.C. App. 593 (2019); *Bite Busters, LLC*, 2021 NCBC LEXIS, at *12–13 (restriction looking back to beginning of employee's tenure was unreasonable).

76. Second, it is not possible to discern as a matter of law what the parties intended from the language of this contract. Both parties' interpretations are plausible. "An ambiguity exists in a contract if the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Barrett Kays & Associates, P.A. v. Colonial Bldg Co., Inc. of Raleigh*, 129 N.C. App. 525, 528 (1998) (citations omitted). "The fact that a dispute has arisen as to the parties' interpretation of the contract is some indication that the language of the contract is, at best, ambiguous." *St. Paul Fire & Marine Ins. Co., v. Freeman-White Assocs., Inc.*, 322 N.C. 77, 83 (1988).

77. Given the ambiguity, the Court leaves to the fact-finder a determination of whether the "two-year period" modifies the second group of customers. "If the writing leaves it uncertain as to what the agreement was, parol evidence is competent, not to contradict, but to show and make certain what was the real agreement between the parties." *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 317 (1989).

However, in that event, interpretation of the contract is a question of fact for the jury. *Id.*; *see also Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.,* 362 N.C. 269, 273 (2008); *Whirlpool Corp. v. Dailey Constr., Inc.,* 110 N.C. App. 468, 471 (1993); *Martin v. Ray Lackey Enterprises, Inc.,* 100 N.C. App. 349, 354 (1990) ("[I]ntent is a question of law where the writing is free of any ambiguity which would require resort to extrinsic evidence or the consideration of disputed fact."); *Cleland v. Children's Home, Inc.,* 64 N.C. App. 153, 57 (1983) (ambiguities in contracts are to be resolved by the jury). The Court observes only that the parties have agreed that the language "shall be construed as drafted by both of them." (Employment Agreement ¶ 22.)[8]

78. But the problems with the customer non-solicitation provision do not end there. Once past the first troublesome "or," the reader is faced with another pair of descriptors. To be a "BB&T Insurance Customer" the Employee must have had material contact with the company or individual, or the company or individual must have been "otherwise contacted or served by Employee regarding *(A) the sale, trade or service or the attempted sale, trade or service of business insurance products or (B)*

---

[8] If the "two-year period" applies to the second group of customers, then the total temporal limitation is four years because "when a non-compete agreement reaches back to include clients of the employer during some period in the past, the look-back period must be added to the restrictive period to determine the real scope of the time limitation." *Farr Assocs., Inc.,* 138 N.C. App. at 280.

The customer-based territory and time limitation must be viewed in tandem when determining the reasonableness of the covenant. *Id.* A four-year restriction approaches the outer limit of reasonableness. "A five-year time restriction is the outer boundary which our courts have considered reasonable, and even so, five-year restrictions are not favored." Id. "[O]nly 'extreme conditions' will support a five-year covenant." *Sterling Title Co. v. Martin,* 266 N.C. App. 593, 599 (2019) (quoting *Hartman,* 117 N.C. App. at 315).

*any other business activities of BB&T Insurance.*" (Employment Agreement ¶ 8(b)(ii) (emphasis added).)

79. Hudson draws a bright line at "(B) any other business activity of BB&T Insurance," arguing that the language is far too broad to be enforceable, especially with a business the size of BB&T Insurance/McGriff that sells and services multiple lines of insurance across the United States, and when Hudson's employment was limited to employee benefits products sold to businesses in and around the Charlotte area. (Hudson Br. Supp. Mot. Dismiss 9.)

80. McGriff counters that the "any other business activity" language is narrowed by language establishing that it applies only to those matters about which Hudson "contacted or serviced" customers. Therefore, McGriff contends, the restriction is necessary to prevent Hudson from bankrolling McGriff's customer goodwill on behalf of a competitor. (Mem. Opp'n Mot. Dismiss 7).

81. The Court agrees that McGriff has a legitimate business interest in protecting its customer goodwill, and "[t]he greater the employee's opportunity to engage in personal contact with the employer's customer, the greater the need for the employer to protect these customer relationships." *Kennedy v. Kennedy*, 160 N.C. App. 1, 12 (2003). *See also United Labs., Inc v. Kuykendall*, 322 N.C. 643, 652 (1988) ("When an employee, during the course of his or her employment, develops or improves customer relationships, the employee is establishing business goodwill, which is a valuable asset of the employer, a principle that this Court has implicitly and explicitly endorsed.").

82. But a provision that, read literally, would prohibit Hudson from soliciting a company or individual with whom he had limited contact regarding any of the business activities of McGriff – even those activities that do not involve the sale of insurance products – is unreasonable in its breadth. *Compare Farr Assocs., Inc.,* 138 N.C. App. at 280 (finding covenant protected former employer's legitimate business interest in customer relationships because employer's work required that former employee "develop an intimate relationship" with its clients) *with Sterling Title Co. v. Martin,* 266 N.C. App. 593, 598–99 (2019) (stating that a restriction that prohibits solicitation of employer's current or former clients with whom defendant had "any form of contact" during his employment "suggests that [the restriction] is unreasonable.").[9]

---

[9] Hudson asks the Court to take judicial notice of the fact that McGriff has itself contended in other litigation that the scope of the covenant must "align" with the employee's precise duties in order to be reasonable. (Hudson Br. Supp. Mot. Dismiss 14, citing *Wells Fargo Ins. Servs. USA*, 2018 NCBC LEXIS at *24.) Hudson contends that McGriff should be held to its own argument and, given that the restriction in this case encompasses more than the sale of *employee benefit plans* from the *Charlotte* office, McGriff should acknowledge its overbreadth.

But while there was *dicta* in *Wells Fargo* suggesting "there *may* be merit" to the "alignment" argument, no North Carolina court has held that the alignment between the scope of the covenant and an employee's duties must be as precise as Hudson suggests. Instead, when evaluating whether the restriction reasonably protects an employer's legitimate business interest, North Carolina courts look more broadly at, among other things, the nature of the business involved, the nature of the employee's duty, and the employee's knowledge of the business operation. *Cf. Hartman*, 117 N.C. App. 307, 312 (1994).

A restriction attempting to prevent the departing employee from doing work even wholly unrelated to his former duties is overly broad, s*ee, e.g.*, *Id.* at 317. The same can be said for customer non-solicitation restrictions. Here, however, the restriction is limited to BB&T Insurance Customers with whom Hudson had relatively recent "material contact" or who he "otherwise contacted or served" regarding "the sale, trade or service or the attempted sale, trade or service of business insurance products." The restriction is not wholly unrelated to Hudson's sales and service activities.

83. In response to McGriff's request that the Court strike from the agreement "any distinctly severable part of the restrictive covenants that the Court might deem to be overly broad as drafted[,]" (Prop. Am. Compl. *ad damnum*), the Court initially observes that it has limited power to cure defects in restrictive covenants. *See Whittaker General Medical Corp. v. Daniel*, 324 N.C. 523, 528 (1988) (refusing to rewrite a contract that was overly broad); *Hartman*, 117 N.C. App. at 317 ("When the language of a covenant not to compete is overly broad, North Carolina's 'blue pencil' rule severely limits what the court may do to alter the covenant.").

84. However, in some circumstances, this state's "blue pencil" rule may be narrowly applied. "A court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant." *Id.* at 317. Application of the "blue pencil" rule is narrow and within the discretion of the Court. *Tech. Ptnrs, Inc. v. Hart,* 298 F. App'x 238, 243 (4th Cir. 2008) (applying North Carolina law).

85. To be a "distinctly separable" provision, other restrictions in the covenant must not be dependent on the portion to be excised. *Sec. Nat'l Investments, Inc. v. Rice,* 2016 N.C. App. LEXIS 1119, 1120 (2016) (unpublished) (citing Jon P. McClanahan & Kimberly M. Burke, *Sharpening the Blunt Blue Pencil: Renewing the Reasons for Covenants Not to Compete in North Carolina,* 90 N.C. L. Rev. 1931, 1955-56 (Sept. 2012).

86. Here, the language at issue, *"or any other business activities of BB&T Insurance,"* is distinctly separable. But Defendants contend that merely striking it

would not be enough to salvage the non-solicitation provision. (Hudson Br. Supp. Mot. Dismiss 11). The Court disagrees. If, as discussed above, a fact-finder were to determine that the "two-year period" applies to the second group identified as "BB&T Customers", then absent the reference to "any other business activity of BB&T insurance," the non-solicitation provision would be reasonably tailored to McGriff's legitimate protectible interests. *See, e.g., NFH, Inc. v. Troutman*, 2019 NCBC LEXIS 66, at \*33 (N.C. Super. Ct. Oct. 29, 2019) (North Carolina's strict blue pencil doctrine allows the court to "avoid scrapping an entire covenant" by "enforc[ing] the divisible parts of [the] covenant that are reasonable."); *Sec. Nat'l Investments, Inc.,* 2016 N.C. App. LEXIS at 1120 (striking sentence defining scope of the restriction because it was too broad and enforcing the remainder). *Cf. Wachovia Ins. Servs., Inc. v. McGuirt,* 2006 NCBC LEXIS 25, at \*89 (N.C. Super. Ct. Dec. 19, 2006) (upholding covenant not to compete where, after striking separately numbered geographic provision, remaining text was not overly broad and could stand on its own); *Welcome Wagon Int'l, Inc. v. Pender,* 255 N.C. 244, 248 (1961) (citations omitted) (striking unreasonable provisions in a string of territorial provisions connected by the word "or").

87. Therefore, the Court determines that the language at issue, ("or (B) any other business activity of BB&T Insurance"), is unenforceable as a matter of law, may properly be "blue penciled," and will not be considered when the balance of the customer non-solicitation provision is construed to determine its enforceability.

88.     Hudson next argues that the non-solicitation provision is overly broad because it includes in the definition of "BB&T Insurance Customer" individuals or companies that Hudson contacted or served regarding the *attempted* sale, trade or service of business insurance.  Prohibiting him from soliciting McGriff's prospective clients, he argues, is unenforceable.  (Hudson Br. Supp. Mot. Dismiss 12.)

89.     McGriff counters that the cases cited by Hudson involved prospective customers with whom the employee had no contact and of whom the employee had no personal knowledge.  They argue that North Carolina courts have upheld covenants, like Hudson's, which "barred the former employee from contacting prospective customers with whom the defendant had contact during his employment."  (Reply Br. Supp. Pl.'s Mot. Leave Am. Compl. 4 ["Pl.'s Reply Br."], ECF No. 65.)

90.     The Court agrees with McGriff.  An employer has a legitimate protectible interest in the goodwill it has developed with a prospective customer.  But to develop that goodwill, the departing employee must have had some contact with the prospective customer.  *See, e.g., Hejl v. Hood, Hargett & Assocs., Inc.,* 196 N.C. App. 299, 307 (2009) (restriction unenforceable when it extended to areas where plaintiff had no connections or personal knowledge of the customers); W*ade S. Dunbar Ins. Agency v. Barber*, 147 N.C. App. 463, 469 (2001) (recognizing the validity of covenant limiting defendant from soliciting prospective customers whom defendant himself had solicited).  Here, the restriction is limited to prospective customers who were "otherwise contacted or served" by Hudson regarding the "attempted sale, trade or service of business insurance products."  Consequently, it is limited to prospective

customers with whom Hudson had some degree of influence and, therefore, it is designed to protect McGriff's developing goodwill.

91. In sum, the Court finds the employee non-solicitation provision is not overly broad, and the Court leaves for the fact-finder a determination of the parties' intent with respect to the blue-penciled customer non-solicitation provision. Accordingly, McGriff's Motion for Leave to Amend Complaint with respect to its breach of contract claim as to Hudson is **GRANTED** and Defendants' corresponding motions to dismiss McGriff's breach of contract claim with respect to the Hudson Employment Agreement are **DENIED**.

## 2. Stetson's Contract

92. A review of Stetson's Non-Solicitation Agreement is necessitated by McGriff's Motion for Leave to Amend its Complaint to add Stetson as a defendant, as well as by Hudson and OneDigital's motions to dismiss McGriff's intentional interference with contract claim as to Stetson, discussed *supra* at paragraphs 120 *et seq*.

93. The Court's analysis again begins with the issue of consideration. Defendants correctly argue that when, as here, an employment relationship already exists before the non-solicitation restriction is imposed, merely continuing the employment relationship is not sufficient consideration to support that restrictive covenant. (*See* Hudson's Br. 4, 6–9 .)

94. In addition, while acknowledging that the guarantee of "a raise, bonus, or other change in compensation" can supply the necessary consideration for a newly-

imposed non-solicitation obligation, Defendants point out that merely being eligible for a *discretionary* raise is insufficient.

95. Here, the Non-Solicitation Agreement states that Stetson "shall be eligible to receive an annual bonus" as consideration for the agreement. However, the specific terms of the bonus plan are not provided, making it *possible* that the bonus was discretionary. In such a case, Defendants argue, any consideration would be illusory, rendering the Non-Solicitation Agreement unenforceable. (Prop. Am. Compl. Ex. D, ECF No. 55.6; Hudson's Br. 4, 6–9.)

96. In response, McGriff observes that "[n]othing on the face of McGriff's Proposed Amended Complaint, or the Agreement itself, suggests that the bonus was discretionary, that Stetson failed to receive the bonus, or that the consideration was illusory." Therefore, McGriff essentially argues that Defendants are tilting at windmills. (Pl.'s Reply Br. 5—6.)

97. When reviewing the Proposed Amended Complaint for futility, it is incumbent on the Court to afford the nonmoving party the benefit of favorable inferences. *See Laster*, 199 N.C. App. at 577 (when reviewing the complaint for sufficiency, non-movant's allegations are liberally construed and generally treated as true). Paragraph 17 of the Proposed Amended Complaint states, "Stetson received certain valuable consideration for [the restrictive covenants], including but not limited to becoming newly eligible to receive an annual bonus based on the terms and conditions of BB&T Insurance's bonus plan." (Prop. Am. Compl. ¶ 17.)

98.     McGriff attached Stetson's contract to the Proposed Amended Complaint as Exhibit D.  The contract literally reads, "[i]n consideration of Employee entering into this Agreement, Employee shall be eligible to receive an annual bonus based on the terms and conditions of (*describe BB&T Insurance's bonus plan*)."  (Prop. Am. Compl. Ex. D (emphasis added).)  Defendants contend that this parenthetical is a "vague placeholder in the agreement" and leaves "material portions [of the agreement] open for future agreement" which, they argue, makes the agreement "nugatory and void for indefiniteness."  (Hudson's Opp'n Mot. Am., quoting *Boyce v. McMahan*, 285 N.C. 730, 734 (1974).)

99.     Unlike the contract in *Boyce*, however, Stetson's contract does not leave material terms open for future negotiation.  *Compare Boyce*, 285 N.C. at 734 ("The 'preliminary' agreement . . . begins by stating that it is a preliminary agreement and closes by reciting that a more detailed agreement will be made at some specific and subsequent date to be agreed upon by the parties"), *with* Prop. Am. Compl. Ex. D (containing neither statement).

100.    Although it is true that Stetson's contract omits a *description* of the bonus plan, there is no indication that such a plan did not yet exist, or that the bonus was discretionary.  Consequently, McGriff has adequately pled that consideration in the form of eligibility for a bonus exists.  *See Laster*, 199 N.C. App. at 577.  *See also Davis v. HCA Healthcare, Inc.*, 2022 NCBC LEXIS 108, at **38 (N.C. Super. Ct. Sept. 19, 2022) ("To dismiss [the plaintiff's] complaint because of some initial skepticism would be to mistakenly collapse discovery, summary judgment, and trial into the pleading

stages of a case." (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 434 (4th Cir. 2015)); *Presnell v. Pell*, 298 N.C. 715, 719 (1979) ("A claim for relief should not suffer dismissal unless it affirmatively appears that plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim.").

101. Defendants next contend that the scope of Stetson's non-solicitation restrictions is not tailored to McGriff's legitimate business interests. With respect to the employee non-solicitation provision, for the same reasons that the Court concludes that Hudson's employee non-solicitation provision is not overly broad, it concludes that Stetson's similarly worded employee non-solicitation provision is not overly broad.

102. As for the customer non-solicitation provision, the excessively broad "or any other business activities of BB&T Insurance" clause must once again be blue-penciled out, but this time the additional troublesome language that created the ambiguity with respect to Hudson's agreement (*see infra* paragraph 78) is absent, and the provision as written is narrowly tailored to protect the goodwill that Stetson might otherwise be able to influence by virtue of her material contact with actual and prospective McGriff customers. Accordingly, absent the blue-penciled clause identified above, McGriff's Motion for Leave to Amend Complaint as to its breach of contract claim with respect to Stetson is **GRANTED**.

**B. Misappropriation of Trade Secrets**

103. The Court moves next to the claim for misappropriation of trade secrets against all three defendants, Hudson, Stetson, and OneDigital. Each Defendant moves to dismiss the claim on the grounds that McGriff has not sufficiently pled

either a trade secret or the requisite acts of misappropriation. Particularly considering the fullness of the allegations in McGriff's proposed amendment, however, the Court determines that the allegations are sufficient to state a claim against each Defendant.

104. In North Carolina a "trade secret" means

"[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

105. Misappropriation means "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent[.]" N.C.G.S. § 66-152(1). Misappropriation does not occur, however, when a trade secret is arrived at by "independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." *Id.*

106. On a motion to dismiss, McGriff must "identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326 (2008) (quoting *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468 (2003)

(citations omitted)). General, sweeping, and conclusory allegations are insufficient. *See Krawiec v. Manly*, 370 N.C. 602, 610 (2018).

107. In paragraph 30 of the Proposed Amended Complaint, McGriff alleges that its confidential information and trade secrets include, but are not limited to:

A. Customer lists and contact information, including the identity of specific customer contacts and point persons;

B. Customer preferences, requirements and buying patterns, including products and services provided to such customers, pricing/premium structures, billing histories, policy cost and sales information, insurance expiration dates, insurance renewal schedules, fee agreements, applications, underwriting, proposals, certificate of holder lists, and claims history;

C. Marketing and sales strategies, financial, operational and customer service information;

D. Detailed compilations of data, created over significant periods of time, regarding each of its customers; and

E. Other internal business information that is proprietary in nature, confidential to BB&T Insurance/McGriff, and not generally available to its competitors or the public at large.

(Prop. Am. Compl. ¶ 30.)

108. McGriff further alleges that its trade secrets include proprietary Excel workbooks developed by BB&T Insurance/McGriff known as "Watson Reports," as well as the customer data therein (such as net claims paid by a benefits plan, actual versus forecast claims for the plan year and trailing 24-month period, historical trends related to the relationship between plan costs, claims and expected claims, loss ratios, and a detailed financial snapshot for the plan). (Prop. Am. Compl. ¶ 32.)

109. In addition to the Watson Reports, McGriff alleges that its trade secrets include "Sherlock Reports," which are proprietary Excel workbooks developed by BB&T Insurance/McGriff that contain "detailed data and analysis related to a customer's insurance plan renewal, including comparative quotes that BB&T Insurance/McGriff obtains for the customer on insurance products and services." (Prop. Am. Compl. ¶ 33.)

110. Finally, in paragraph 120 of the Proposed Amended Complaint, McGriff summarizes the trade secrets at issue as:

> compilations of customer data, claims history, policy information and terms, fee agreements and renewal dates, as well as information concerning customer service, projects and proposals. This includes, but is not limited to, the pharmacy program McGriff was working on for Vector Fleet Management and other McGriff customers, personnel information regarding McGriff employees, and proprietary tools such as the Watson Reports and Sherlock Reports.

(Prop. Am. Compl. ¶ 120.)

111. McGriff alleges that these trade secrets are the subject of "substantial time, money, and effort in developing, compiling, and safeguarding such materials and information for its business use and to obtain a competitive advantage." (Prop. Am. Compl. ¶ 121.) Some of the efforts to maintain its secrecy include the use of confidentiality agreements, enforcement of company policies dealing with proprietary information, password protection, dual authentication, and other cybersecurity measures. (Prop. Am. Compl. ¶¶ 35–36, 122.)

112. Defendants argue that, even if permitted to amend, McGriff's trade secret allegations fall short of stating a claim. (Hudson Br. Resp. Mot. Amend 12–18, ECF No. 61.) They contend that some of the information identified by McGriff (the names

of customers, a pharmacy proposal and personnel information) constitutes the type of "general skills and knowledge" acquired by Hudson and Stetson during their employment that falls outside the ambit of North Carolina's Trade Secret Protection Act. They further argue that McGriff's allegation that former employees provided McGriff's Watson and Sherlock Reports to Hudson undercuts McGriff's allegation that it made reasonable efforts to protect their secrecy, and that McGriff's policy information and renewal dates are data publicly available on IRS Forms 5500. (Hudson Br. Resp. Mot. Amend 12-17.)

113. McGriff counters that Defendants are subjecting its allegations to a preliminary injunction or even a summary judgment standard, not one appropriate for either a Rule 12(b)(6) sufficiency analysis or a Rule 15 futility analysis. For now, McGriff argues that it has identified its trade secrets with sufficient particularity for Defendants to understand what it is they are accused of misappropriating, and that is all that is required at this stage. (Pl.'s Reply Br. 8–11.)

114. McGriff further responds that the fact that two other employees may have also misappropriated the Watson and Sherlock Reports does not establish as a matter of law that McGriff failed to engage in efforts that were reasonable under the circumstances to protect their secrecy. In addition, McGriff contests Hudson's contention that one can use IRS Forms 5500 to glean the customer information it has compiled. (Mem. Opp'n Mots. Dismiss 13.)

115. The Court agrees that the Proposed Amended Complaint sufficiently pleads a claim for misappropriation of trade secrets. At this stage, McGriff does not have to

prove that the listed documents and information constitute trade secrets. It must merely allege what it contends constitutes a trade secret sufficiently to allow the Defendants "to delineate that which [they are] accused of misappropriating . . . ." *Washburn*, 190 N.C. App. at 326.

116. While information collected in the routine course of business, without any effort to compile, develop, or maintain the information may not constitute a trade secret, McGriff's description of the data compilations at issue in this case compares favorably to descriptions in prior cases that have passed muster when challenged under Rule 12(b)(6). *See, e.g., State ex rel. Utils. Comm'n v. MCI Telecomms., Corp.*, 132 N.C. App. 625, 634 (1999) ("compilation of information" involving customer data and business operations constituted trade secret); *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at \*13 (N.C. Super. Ct. May 1, 2015) ("[T]he Court of Appeals has held that where an individual maintains a compilation of detailed records over a significant period of time, those records could constitute a trade secret even if 'similar information may have been ascertainable by anyone in the . . . business.'") (citing *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376 (2001). *See also AYM Techs., LLC v. Rodgers*, 2018 NCBC LEXIS 14, at \*38–39 (N.C. Super. Ct. Feb. 9, 2018) (collecting cases).

117. McGriff has adequately pled misappropriation as well. For example, McGriff alleges that Hudson provided to OneDigital McGriff's Fee Agreements with its customers, contact information for customer point persons, and insurance renewal dates. (Prop. Am. Compl. ¶ 70.) McGriff further alleges that Hudson acquired the

Sherlock and Watson reports from two former McGriff employees, neither of whom was authorized to possess or disclose the information, and that he has used the reports to further his business. (Prop. Am. Compl. ¶¶ 71–74, 77.) McGriff also alleges that Hudson's use of information in a pharmacy proposal McGriff presented to a customer, Vector Fleet Management, was a misappropriation of the trade secret information in the proposal. (Prop. Am. Compl. ¶ 82.) McGriff alleges that Defendants used McGriff's confidential personnel information, without authorization, "in order to solicit and recruit McGriff employees and encourage and support their departure from McGriff to join OneDigital." (Prop. Am. Compl. ¶ 132.)

118. In short, McGriff avers that Hudson, with the help of Stetson, has disclosed and used the trade secrets to benefit OneDigital, which in turn gave OneDigital an unfair competitive advantage. (Prop. Am. Compl. ¶¶ 69–77, 95, 120.) These allegations are sufficient to survive both a Rule 12(b)(6) sufficiency challenge and a futility challenge under Rule 15. *See, e.g., Tribike Transp. v. Essick*, 2022 NCBC LEXIS 143, at **7 (N.C. Super. Ct. Nov. 30, 2022) (allegations of confidentiality, uniqueness of the information to a company, and lack of ready discoverability from public information met the pleading standard); *United Therapeutics Corp. v. Liquidia Techs.*, 2022 NCBC LEXIS 120, at **13–14 (N.C. Super. Ct. Oct. 13, 2022) (allegations that former employee had access to trade secrets, carried them to a competitor, and used them to benefit the competitor were sufficient to plead misappropriation); (*Mech. Sys. & Servs., Inc. v. Howard*, 2021 NCBC LEXIS 69, at *7 (N.C. Super. Ct. Aug. 11, 2021) (allegations that former employee accessed trade secrets after deciding to join

a competitor, kept them in his possession, and used them to solicit his former employer's customers sufficient to state a claim for misappropriation.)

119. Accordingly, the Court **GRANTS** Plaintiff's Motion for Leave to Amend Complaint with respect to its misappropriation of trade secrets claim, and Defendants' corresponding motions to dismiss this claim are **DENIED.**

### C. Tortious Interference with Contract

120. Defendants next move to dismiss McGriff's claims for tortious interference with contract against Hudson and OneDigital. With respect to OneDigital alone, the allegations are that it induced Hudson to breach his Employment Agreement, to misappropriate its trade secrets, and to wrongfully solicit its employees and customers. As for OneDigital and Hudson together, the claim is that they unjustifiably induced Stetson to breach her Non-Solicitation Agreement and to use McGriff's trade secret information to solicit other employees and customers. (Prop. Am. Compl. ¶¶ 104-111.)

121. A claim for tortious interference requires: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC,* 368 N.C. 693, 700 (2016) (citation omitted). Given the potential for restraint on legitimate competition, the pleading standards for a tortious interference with contract claim are strict. *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017NCBC LEXIS 27, at *16 (N.C.

Super. Ct. March 27, 2017) ("The complaint must admit of no motive for interference other than malice.").

122. First, with respect to the claim that OneDigital interfered with Hudson's Employment Agreement and that both Hudson and OneDigital interfered with Stetson's Non-Solicitation Agreement, the Court has found that valid agreements exist.[10] Moreover, on the face of the Proposed Amended Complaint, it is alleged that OneDigital both knew of Hudson's Employment Agreement with McGriff during the relevant time frame and induced him to breach it. It is further alleged that OneDigital and Hudson were aware of Stetson's Employment Agreement with McGriff and induced her to breach it. (*See* Prop. Am. Compl. ¶¶ 106–09). The focus of the motions, then, is on the fourth element of a tortious interference with contract claim: whether Defendants had legal justification for allegedly inducing Hudson and Stetson to violate their contracts.

123. McGriff contends that it has adequately alleged that Digital lacked legal justification for its interference with Hudson's contract. (Mem. Opp'n Mots. Dismiss 10.) While McGriff acknowledges that ordinary competition constitutes justifiable interference, it argues that the competitive privilege to "interfere" is lost if it is exercised for a wrongful purpose. (Mem. Opp'n Mots. Dismiss 10.) Thus, McGriff invites the Court to find that OneDigital's alleged goal of using Hudson and Stetson to misappropriate its trade secret information, disrupt its business operations, and

---

[10] Even if a fact-finder ultimately construes the non-solicitation provisions in the Hudson Employment Agreement as too broad, the confidentiality provision, which is not subject to the same level of scrutiny, creates a contractual obligation on the part of Hudson to McGriff.

otherwise engage in unfair competition constitutes an improper motive that satisfies this element of the tort. (Mem. Opp'n Mots. Dismiss 10–11.)

124. OneDigital responds that McGriff's allegations are conclusory and lack a supporting factual basis, a flaw it argues is fatal to this claim. (Digital's Mot. Dismiss Br.7–8). In addition, it cites *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at **36 (N.C. Super Ct. July 10, 2002) in support of its argument that to defeat the competitive privilege, McGriff is required to allege "some monopolistic purpose." (Digital's Mot. Dismiss Br. 7.)

125. Unjustifiable interference, otherwise known as legal malice, is not synonymous with actual malice. It is "the intentional doing of a harmful act without legal justification." *Murray v. Justice*, 96 N.C. App. 169, 174 (1989). In addition, for interference to be justified, it must be carried out by means that are lawful. Indeed, "[n]umerous authorities have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and *by means that are lawful*." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221 (1988) (emphasis added).

126. Among other things, McGriff alleges that Hudson and OneDigital's interference involved the misappropriation of McGriff's trade secret information. These allegations, if true, constitute unlawful conduct and by definition cannot be justifiable interference. *Cf. Med1 NC Servs., LLC v. Med1 Plus, L.L.C.*, 2020 NCBC LEXIS 24, at *30 (N.C. Super Ct. Feb. 26, 2020) (improper use of confidential

information constitutes intentional interference with prospective economic advantage); *Roane-Barker v. Southeastern Hosp. Supply Corp.*, 99 N.C. App. 30, 39 (1990) (hiring employee for the purpose of soliciting the same customers he serviced for plaintiff in violation of non-solicitation agreement is not legal means of competition).

127. Moreover, Plaintiff alleges that OneDigital's "distinctive" consulting arrangement with Hudson and the employment of his colleague, Stetson, was designed as an attempt to circumvent their contractual commitments and to solicit its customers and use its trade secret information, all in an effort to disrupt McGriff's business operations. These allegations, if true, do not constitute lawful means of competition. *See, e.g., Sandhills Home Care, L.L.C.*, 2016 NCBC LEXIS 61, at \*\*46–48 (a specific plan or scheme to destroy plaintiff's business went beyond "reasonable competitive behavior").

128. Accordingly, with respect to the Tortious Interference with Contract claim against Hudson (regarding Stetson's Non-Solicitation Agreement) and OneDigital (regarding both the Hudson and Stetson's employment obligations), the Court **GRANTS** McGriff's Motion for Leave to Amend Complaint and **DENIES** Defendants' corresponding motions to dismiss.

### D. Tortious Interference with Contract and Prospective Business Relations

129. McGriff also alleges tortious interference with customer contracts and prospective business relations against both Hudson and OneDigital for allegedly

unjustifiably interfering with McGriff's existing Fee Agreements with its customers, as well as with its potential renewal business. (Prop. Am. Compl. ¶¶ 112–118.)

130. Hudson argues that his conduct amounted to nothing more than regular competition given that each customer had the ability to terminate its Fee Agreement with McGriff on thirty days' notice. (Hudson's Opp. Motion Amend 11.) But Hudson does not address McGriff's allegations that Hudson "advised certain BB&T Insurance Customers—specifically, Arroweye Solutions and PLI—about how they could get out of paying the amounts due and payable under their Fee Agreements with McGriff," or that at Hudson's request, OneDigital "engaged [its] attorneys to . . . determine how customers could avoid compliance." (Prop. Am. Compl. ¶¶ 84–85.)

131. As for renewal business, McGriff alleges that, while still employed, Hudson purposefully "failed to request or procure Fee Agreement renewals for three BB&T Insurance Customers—Vector Fleet Management, LLC, City of Kings Mountain, and Arroweye Solutions—whose Fee Agreements with McGriff became due for renewal on September 1, 2021." It alleges upon information and belief that Hudson "deliberately refrained from securing signed renewal agreements from these customers in order to solicit and divert their Employee Benefits business on behalf of himself and OneDigital. (Prop. Am. Compl. ¶ 61.)

132. In addition, McGriff avers that Hudson has provided its trade secret information to OneDigital and has himself used its trade secret information, including that found in its Watson and Sherlock Reports, to compete against it for renewals. (Prop. Am. Compl. ¶¶ 70-77, 83.)

133. Finally, McGriff alleges upon information and belief that with regard to a pharmacy project McGriff had been working on with Vector, Hudson stated that "he understood, through Stetson, that the 'new guy' assigned to the account after Hudson left McGriff had made errors in the pharmacy project exhibits that would increase the costs by as much as double, and that McGriff's proposals for other customers had been wrong, too." McGriff further alleges, upon information and belief, that "Hudson has made similar statements to other BB&T Insurance Customers about McGriff's pharmacy proposals . . . to divert the customer's business from McGriff and solicit these accounts on behalf of himself and OneDigital." (Prop. Am. Compl. ¶¶ 78–79.)

134. The Court has already discussed the elements of a tortious interference with contract claim. Applying those elements here, the Proposed Amended Complaint alleges the existence of enforceable Fee Agreements, that Hudson and OneDigital were aware of these Fee Agreements, that their actions inducing Arroweye Solutions and other customers not to perform pursuant to the Fee Agreements were intentional and unjustified, and that McGriff was damaged. (Prop. Am. Compl. ¶¶ 113-116.) Again, McGriff's allegation that Hudson and OneDigital misappropriated its trade secret information in order to interfere with its Fee Agreements supplies the necessary legal malice to state a claim for interference with existing contracts.

135. "An action for tortious interference with prospective economic advantage is based on conduct by the defendant[ ] which prevents the plaintiff[ ] from entering into a contract with a third party." *Southeast Anesthesiology Consultants, PLLC v. Rose,*

2019 NCBC LEXIS 52, at *35 (N.C. Super. Ct. August 20, 2019) . To state such a claim, McGriff must allege that a contract would have been formed but for Defendants' interference. "[T]he plaintiffs must allege facts to show that the defendant[ ] acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" *Id.* (quoting *Radcliffe v. Avenel Homeowners Ass'n*, 248 N.C. App. 541, 567 (2016)).

136. At issue is whether there are sufficient facts alleged to support the contention that the renewals and pharmacy proposals would have resulted in contracts but for Hudson and OneDigital's interference. McGriff alleges that its Fee Agreements with Arroweye Solutions and others "would have continued without OneDigital's and Hudson's interference." (Prop. Am. Compl. ¶ 116.) While lean, given the totality of the facts alleged, and given the liberal construction that notice pleading requires, *Embree Const. Group., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 500 (1992), the Court determines that the allegations with respect to these established customers is sufficient to allow the claim to move forward to discovery.

137. The same is not true of the pharmacy proposals, however. From the face of the Proposed Amended Complaint, it is not possible to discern whether McGriff alleges that it was deprived of contractual relationships that would otherwise have occurred but for Hudson's alleged interference. Therefore, to the extent McGriff seeks to assert a claim for tortious interference with respect to the pharmacy proposals, McGriff's Motion for Leave to Amend Complaint is **DENIED.**

138. In other respects, McGriff's Motion for Leave to Amend Complaint as to the Tortious Interference with Prospective Business Relations claim is **GRANTED**, and Defendants' corresponding motions to dismiss this claim are **DENIED**. *But see Sports Quest, Inc. v. Dale Earnhardt, Inc.*, 2004 NCBC LEXIS 10, \*\*23 (N.C. Super. Ct. March 12, 2004) (on summary judgment, evidence only that plaintiff had an expectation of future contracts with current customers is insufficient to maintain tortious interference with prospective advantage claim) (*citing Dalton v. Camp*, 353 N.C. 647, 655 (2001)).

### E. Violation of North Carolina's Unfair and Deceptive Trade Practices Act

139. To state a claim under the North Carolina Unfair and Deceptive Trade Practices Act, ("UDTPA"), N.C.G.S. § 75-1.1, a complainant must allege "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 593 (2005) (quoting *Spartan Leasing v. Pollard*, 101 N.C. App. 450, 460–61 (1991)); *see also* N.C.G.S. § 75-1.1. The allegations must include "egregious or aggravating circumstances." *Dalton v. Camp*, 353 N.C. 647, 657 (2001); *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62 (1992).

140. "A practice is unfair if it is unethical or unscrupulous and is deceptive if it has a tendency to deceive." *Sports Quest, Inc.*, 2004 NCBC LEXIS 10, at \*\*24 (*quoting Marshall v. Miller*, 302 N.C. 539, 548 (1981)). Whether an act is unfair or deceptive

is a question of law for the court. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000).

141. McGriff bases its claim for violation of the UDTPA in large part on its claims for tortious interference and misappropriation of trade secrets. Defendants argue that these underlying claims fail, and therefore, so must the claim for unfair and deceptive trade practices. (Hudson's Opp'n. Mot. Am. 19.)

142. Because the Court has found that McGriff has adequately pled claims for tortious interference and misappropriation of trade secrets, its claim for unfair and deceptive trade practices also survives. *See, e.g., NFH, Inc. v. Troutman,* 2019 NCBC LEXIS 66, at *64-65 (N.C. Super. Ct. Oct. 29, 2019) (it is well-settled that both violation of the State's Trade Secret Protection Act and tortious interference with contract may constitute the basis for a UDTPA claim).[11]

143. Therefore, the Court **GRANTS** McGriff's Motion for Leave to Amend Complaint as to its claim for violation of the Unfair and Deceptive Trade Practices Act and **DENIES** Defendants' corresponding motions to dismiss.

## Counterclaim Motion

144. The Court now addresses McGriff's Motion to Dismiss Hudson's counterclaims.

---

[11] *See also Velocity Sols., Inc. v. BSG Fin., LLC*, 2016 NCBC LEXIS 19, at *7-8 (N.C. Super. Ct. Feb. 22, 2016) (granting motion to dismiss breach of contract claim but denying motion to dismiss UDTPA claim where plaintiff alleged defendant had "specifically engaged and directed [plaintiff's former employee] to utilize [p]laintiff's confidential and proprietary information in order to achieve competitive gain.").

## A. Tortious Interference with Prospective Economic Advantage

145. Hudson alleges that a McGriff executive, Ray Sanders, falsely represented to one of Hudson's former clients, Vector, that "because of Hudson's Employment Agreement" Hudson was "not permitted to handle" Vector's account for two years. (Counterclm. ¶¶ 19, 21.) Hudson also alleges upon information and belief that Sanders "has continued to perpetuate the lie that Hudson has a non-competition obligation to McGriff and is precluded from working with former customers." (Counterclm. ¶ 23.)

146. As a result of the alleged misrepresentation, the counterclaim avers that the customer signed a renewal with McGriff. (Counterclm. ¶¶21-22.) Hudson further alleges that but for this interference, "Vector, among others, would have sent business to Hudson and/or contracted with Hudson Consulting for procurement of employee benefit insurance products. (Counterclm. ¶ 33.)

147. Hudson argues that Sanders has misrepresented the truth because there is no legal restraint on Hudson's ability to provide service to customers, including Vector, provided the customers proactively contact Hudson on their own accord. (Counterclm. ¶¶ 23, 29).

148. The Court first observes that the language of the non-solicitation provision is not limited to which party to the prospective contract makes the first contact. Regardless of who initiates the communication, Hudson may not "[s]olicit, contact, divert, or call upon with the intent of doing business with, any 'BB&T Insurance Customer' . . . if the purpose of the activity is to solicit the BB&T Insurance Customer for a Competitive Business." (Employment Agreement ¶ 8(a)(iii).) In particular, use

of the word "divert" in this context conveys an intention for the provision to prevent Hudson from being more than just the instigator.[12]

149. However, the question here is whether Sanders' statement was protected by the competitor privilege. Consequently, survival of this claim depends on whether the customer non-solicitation provision in Hudson's Employment Agreement is, in fact, enforceable. If it is, then Sanders' decision to inform Vector of the existence of the obligation was a legal means of competition. If it is not, then Sanders' decision to communicate that Hudson was contractually prevented from handling the account is not true, and Sanders' tactic is not a legal means of competition. As discussed above, a determination regarding enforceability awaits the development of a fuller record to determine the parties' intentions with respect to the definition of "BB&T Insurance Customer." For now, however, the claim survives.[13]

150. Therefore, the Court **DENIES** Plaintiff's Motion to Dismiss Defendants' Tortious Interference with Prospective Economic Advantage counterclaim.

---

[12] For the same reason, the Court is not convinced that referring to the provision in question as a "non-compete" as opposed to a "non-solicitation" provision—if, in fact, that's what Sanders did—changes anything. Regardless of its use of the verb "solicit" among others, the provision is a species of noncompetition clause.

[13] Furthermore, as was the case with McGriff's interference with prospective contractual relationships claim, Hudson's allegations, while bare-bones, get him past a motion challenging the sufficiency of his pleading. However, as the case progresses, more will be required to prove that the claim is not speculative.

### B. Violation of North Carolina's Unfair and Deceptive Trade Practices Act

151. Lastly, the Court addresses McGriff's motion to dismiss Hudson's counterclaim asserting an alleged violation of North Carolina's Unfair and Deceptive Trade Practices Act. Because the Court has determined that Hudson's intentional interference claim survives, so too does his claim for violation of the UDTPA based on the same allegations.[14] *See, e.g., United Labs., Inc.,* 322 N.C. at 665 (holding that the UDTPA may apply to "tortious interference with contract situations").

152. Accordingly, the Court **DENIES** Plaintiff's Motion to Dismiss Hudson's UDTPA counterclaim.

## IV. CONCLUSION

153. For the foregoing reasons, the Court hereby **GRANTS in part and DENIES in part** Plaintiff's Motion for Leave to Amend Complaint as stated herein, **DENIES** both Defendants' Motions to Dismiss, and **DENIES** Plaintiff/Counter-Defendant's Motion to Dismiss Counterclaims.

---

[14] Given the Court's ruling, the Court does not address Hudson's argument that regardless of whether he states a claim for interference with prospective economic advantage, the alleged purposeful misrepresentations regarding his contractual commitments to McGriff are a sufficient basis for this claim. However, as this Court has stated: "Although certain causes of action, standing alone, may evoke the action, a claim for unfair and deceptive trade practices pursuant to N.C.G.S. § 75-1.1 is an independent claim that stands alone as a distinct action. Therefore, so long as the complaint includes sufficient factual allegations of potentially unfair or deceptive conduct, the claimant may still maintain a UDTP claim, notwithstanding the dismissal of breach of contract or tort causes of action based on the same conduct." *Charah, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at *19-20 (N.C. Super. Ct. April 17, 2020) (cleaned up).

154. McGriff is directed to file its Amended Complaint, consistent with the Court's rulings herein, within seven (7) days.

This the 17th day of January, 2023.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases